IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE CRIDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.  4:12-CV-823-JCH-SPM |
| | ) | |
| | ) | |
| CAROLYN W.  COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the

application of Plaintiff Diane Crider for disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act").  This matter was referred to the undersigned

United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C.

§ 636(b).  The undersigned recommends that the decision of the Commissioner be affirmed.

## I.  FACTUAL BACKGROUND

### A.  BACKGROUND

Plaintiff testified before an ALJ at a hearing on November 10, 2010.  (Tr. 26-35).

Plaintiff was born January 9, 1964.  She has a blood clot (a deep vein thrombosis) in her left leg.

(Tr. 30).  It causes constant pain from her knee down through her calf, which she rates as a nine

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant in this case.

out of ten in severity. (Tr. 30-31). She takes Vicodin[2] every day for the pain, which helps but makes her a little sleepy. She also has constant pain from arthritis in her hips; she rates that pain as a ten. (Tr. 31). Because of her pain, she cannot sit for more than 20 minutes without changing positions, cannot walk for more than 20 to 50 feet, and cannot stand for more than 20 minutes. (Tr. 31-32). She has to lie down and elevate her leg at least once an hour, typically for about 25 minutes each time. (Tr. 32).

Because of her pain, she cannot lie on her sides, which causes her to have trouble sleeping; she takes a sleeping pill every night. She gets about seven hours of sleep a night. (Tr. 33).

Plaintiff experiences fatigue during the day. She has depression due to her medical issues and the fact that she lost her job, though she is not taking any medication for that at present. (Tr. 33).

Plaintiff had cancer, which is in remission. Her last chemotherapy and radiation treatments were in March 2009. (Tr. 34).

In a December 2009 Function Report, Plaintiff stated that she feeds her pets and takes them out; prepares sandwiches, dinners, and complete meals; does cleaning once a week for four hours; does ironing twice weekly for 15 minutes; washes dishes daily for 20 minutes; drives and rides in cars; goes out alone; goes grocery shopping once a week for an hour (leg permitting); and works in flowerbeds "when [she] is able to do it." However, she stated that she has to keep her leg elevated for the biggest part of her day; cannot ride in a car too far; needs help taking out trash and picking up rugs; cannot work with her flowers as much because of the bending down, squatting, and walking in the yard; can only walk for 20 feet without needing a rest; does not

---

[2] Vicodin is a medication containing hydrocodone and acetaminophen; it is used to relieve moderate to severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

shop or exercise like she used to; and has depression and trouble concentrating due to her severe pain and worries about her physical condition. (Tr. 168-75).

Plaintiff last worked in December 2008 doing "production work," which involved a lot of heavy lifting, walking, and standing all day. (Tr. 34).

### B. TREATMENT RECORDS

On December 11, 2008, Plaintiff saw Jane Moore, a nurse practitioner, complaining of bilateral leg pains in her upper thighs and calves that began about a month earlier. (Tr. 548). At a follow up appointment on December 18, 2008, Ms. Moore found a cervical mass, and a biopsy revealed invasive squamous cell carcinoma. (Tr. 195, 205-06, 545-46).

On December 22, 2008, Plaintiff saw Dr. Mary Graham, M.D., for a consultation with regard to her newly diagnosed cervical cancer. (Tr. 501). Her thighs and calves hurt, and she was taking Vicodin. (Tr. 501-02). Her extremities showed no edema,[3] clubbing, or cyanosis. (Tr. 503). Her review of symptoms was negative for depression and mental illness but positive for some anxiety and fatigue. (Tr. 502).

Between January and March 2009, Plaintiff underwent chemotherapy and radiation treatment for her cervical cancer, and the record contains numerous notes from Dr. Mary Graham and Dr. Joseph C. Bond, M.D., related to her treatment. (Tr. 248, 259-72, 281-83, 292-99, 446-97).

On February 9, 2009, Plaintiff reported to Dr. Graham that she had increased pain in her hips and pelvis. She was prescribed oxycontin for pain. On February 16, 2009, her left leg was swollen and painful. (Tr. 276). An echo report revealed acute deep vein thrombosis ("DVT") of

---

[3] Edema is "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues" or, "at the gross level, used to describe the physical sign commonly likened to swelling or increased girth that often accompanies the accumulation of fluid in a body part, most often a limb." *Stedman's Medical Dictionary*, at 612 (28th ed. 2006).

the left leg, as well as soft tissue edema in the calf and thigh area. (Tr. 249-51). Dr. Graham prescribed Lovenox.[4] (Tr. 274).

On February 17, 2009, it was noted that Plaintiff was "currently able to meet most ADLs" but that she had requested assistance with obtaining a rolling walker for use at home. She was advised to request it at another clinic but was informed that insurance might not cover the item. (Tr. 273).

On February 23, 2009, Dr. Bond's progress notes indicate that Plaintiff had a normal gait and station; was using a wheelchair and felt weak; had edema and evidence of DVT in her left leg; and had a normal mood/affect. (Tr. 292). A review of symptoms showed fatigue, loss of appetite, sleep disturbance, and dry mouth, but no musculoskeletal or psychological symptoms. (Tr. 293).

In treatment completion notes dated March 17, 2009, Dr. Graham stated, "I think patient tolerated her [cancer] therapy reasonably well; however, she did develop a deep venous thrombosis near the beginning of her treatment and had to be on Lovenox therapy." (Tr. 445).

On April 23, 2009, Dr. Bond's progress notes indicate that Plaintiff had DVT and bilateral hip pain; had a normal gait and station and was ambulatory; had left calf and foot pain and edema in her left leg; and had a normal mood and affect. (Tr. 290). Dr. Graham's notes from the same day indicate that Plaintiff "complain[ed] of some occasional pain in both hips," still tired easily, and did not feel she was able to return to work. She had no edema, clubbing, or cyanosis in her extremities, though she had a mild increased in the size of her left calf and some

---

[4] Lovenox is an injectable medication used to prevent and treat blood clots. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601210.html

mild bluish discoloration of her leg.  It was noted that she was to continue on Coumadin[5] for her DVT.  (Tr. 434).  On April 24, 2009, a unilateral venous duplex exam with color and spectral Doppler ordered by Dr. Joseph Bond showed obstructive DVT in the left femoral vein and non-obstructive partial DVTs in the left common femoral and profundus femoral veins.  (Tr. 367-68).

On July 30, 2009, Dr. Graham noted that Plaintiff "has really been doing a lot better"; that she "still complains of some achiness in her hips, but it is really diminished"; and that she took Tylenol once or twice a day.  Her energy was poor, she felt she had no stamina, and she was concerned about being ready to return to work.  (Tr. 256).  Dr. Graham referred her to physical therapy in the cancer rehabilitation program.  (Tr. 257).

On August 11, 2009, Plaintiff went to the Phelps County Regional Medical Center for physical therapy.  She had pain around her pelvis and legs that was worse in the morning, she had returned to doing chores and activities around the house but was still very weak and had poor endurance, and she had functional limitations with regard to lifting and prolonged standing. (Tr. 421).  Plaintiff returned to physical therapy on numerous occasions in August and September 2009.  (Tr. 397-405, 414-420).

On August 12, 2009, Dr. Bond's progress notes indicate that Plaintiff had a normal gait and station, was ambulatory, had no edema in her arms or legs, and had a normal mood/affect. However, she had evidence of DVT.  (Tr. 288).  A review of symptoms showed joint pain, stiffness, blood clotting problems, chills, and sweats.  (Tr. 289).

On August 24, 2009, Plaintiff saw Jane Moore to go over disability papers.  (Tr. 524-25). It was noted that Plaintiff's previous employment required her to recurrently move 50 pounds and stand all day and that she had been unable to complete her activities or her job.  She stated

---

[5] Coumadin is a brand name for warfarin, which is used to prevent blood clots from forming or growing larger.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html

that she was up to lifting 7.5 pounds. She still had consistent pain in her left calf. (Tr. 524). Plaintiff told Ms. Moore that she could not stand for more than 30 minutes at a time and that she could read, handle, use her hands, push, pull, and use fine manipulation, but that she was unable to stand and walk more than 30 to 60 minutes intermittently. Ms. Moore stated, "She may return to modified work with the restrictions that she can only stand or walk one third of an 8 hour day and this is intermittent, same with climbing her weight restriction is currently 7.5 pounds until it has been documented that she can continuously lift in greater amounts with her physical therapy." Plaintiff was advised to continue on Coumadin therapy. (Tr. 525).

On September 10, 2009, physical therapy notes stated that Plaintiff had "improved her endurance to return to work" and was "able to lift 25# lbs. to various levels with no c/o pain or discomfort," though she was "sore post tx." (Tr. 400). She was discharged from physical therapy on September 18, 2009 "per good progress and completion of present orders." All of her goals were listed as "met," including "decrease pain to 3/10 with daily activities," "pt improve endurance to return to work," and "pt tolerate work conditioning." (Tr. 403).

On October 1, 2009, Plaintiff returned to Dr. Graham for follow-up. Plaintiff had had five weeks of cancer rehab and strengthening and reported that it had helped her significantly. She reported that she felt stronger, and she denied any pain other than some hip and thigh achiness for which she took Tylenol Extra Strength. Dr. Graham could not feel any residual tumor on Plaintiff's cervix. (Tr. 254). Dr. Graham signed a note stating that Plaintiff "may return to full time work." (Tr. 255).

On November 6, 2009, a unilateral venous duplex exam with color and spectral Doppler (performed due to leg pain) showed obstructive thrombophlebitis throughout the left femoral vein and non-obstructive partial thrombophlebitis in the left common femoral and profundis

veins.  It was noted that the findings "appear to represent chronic thrombophlebitis had been present since Feb 2009."  (Tr. 640-42).

On November 10, 2009, Plaintiff presented to Shannon Wright, APRN, BC, FNP, with ongoing left leg pain.  She had returned to work the prior week and stated that it was "unbearable."  It was noted that she had no ability to modify her position to a sitting job.  She had also been given tramadol[6] by Jane Moore, the nurse practitioner whom she primarily sees, but she stated that was not helpful whatsoever.  She stated that she was wearing compression socks on her left leg.  Plaintiff complained of ongoing anxiety and insomnia, though she did not feel terribly depressed.  (Tr. 513).  Nurse Wright's assessment was insomnia to be treated with Ambien, DVT to be treated with continued Coumadin and possible surgery, cervical cancer in clinical remission, and anxiety/situational depression to consider treating with "serotonin-type medication."  (Tr. 514).

On November 24, 2009, Shannon Wright sent a letter "To Whom It May Concern" indicating that Plaintiff "is having some trouble with her medical condition that requires her to have no prolonged sitting or standing."  Ms. Wright stated, "I feel that my patient needs to be off work at this time and I am unsure when she will return to work."  (Tr. 512).

On December 22, 2009, Plaintiff saw Kurt Nichols, M.D., for a second opinion regarding her DVT.  (Tr. 590).  A bilateral lower extremity venous duplex ultrasound was performed, and the impression was chronic, non-occlusive left superficial femoral vein thrombus, consistent with patient history.  (Tr. 592).  Dr. Nichols' assessment was that "she should remain on Coumadin lifelong.  There is no further recommendation needed."  He also stated, "The patient has no evidence of leg pain.  There is no evidence of venous stasis or any further pathology."  (Tr. 591).

---

[6] Tramadol is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html

On January 8, 2010, Plaintiff saw Dr. Graham for routine follow-up regarding her cervical cancer treatment. She had been discharged from her job and was seeking disability. It was noted that she had in general been doing okay. However, when she attempted to go to work and was standing on her feet for long periods of time, she had too much pain in the left hip and thigh. It was noted that the pain was usually present in the left thigh or calf and that it was especially brought on by being on her feet for any extended period of time. There was minimal edema in her left leg, and she had good ambulation and no focal motor or sensory loss. (Tr. 638). The hip pain she was having was diminishing. She used Vicodin for pain, but not very often. Plaintiff also complained of some difficulty with sleep; Ambien helped, but she used it sparingly. (Tr. 637).

On January 15, 2010, Plaintiff saw Jane Moore for a checkup and paperwork completion. It was noted that she had to stop work because she could not stand. She stated that she could not even sit for longer periods of time without getting up and moving around. She was very tearful about no longer being able to work and felt that she was getting some mild depression. She had a fullness of the left calf compared to the right. (Tr. 678). Plaintiff was currently on Tylenol for discomfort, and Ms. Moore started her on Cymbalta[7] for chronic pain and depression. (Tr. 679).

On January 29, 2010, Plaintiff saw Jane Moore for follow up regarding chronic pain in her lower left extremity and for mild depression. Plaintiff thought her mood was a little brighter and that her left leg pain was somewhat improved as well. Physical therapy had been recommended, but Plaintiff deferred it. (Tr. 674). Ms. Moore increased Plaintiff's dosage of Cymbalta for pain and noted that Plaintiff's depression was improving with the Cymbalta. (Tr. 674-75).

---

[7] Cymbalta is a brand name for duloxetine, which is used to treat both depression and ongoing bone or muscle pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

On April 7, 2010, Plaintiff saw Jane Moore with complaints of not feeling good for three days; headaches; feeling hot; and left foot pain. She had stopped taking Cymbalta because she did not feel like it was effective; she was taking Ambien and Coumadin but was taking no other medications. (Tr. 665). Ms. Moore assessed hypertension new onset, to be treated with lisinopril; cephalalgia related to hypertension; DVT with Coumadin therapy; chronic left ankle and foot pain; and situational disorder. (Tr. 665-66).

On April 8, 2010, Plaintiff saw Dr. Graham, reporting that the prior Sunday she had felt poorly, lightheaded, and had an irregular heartbeat. She stated that her foot and calf hurt and that she wore an elastic Ted hose stocking but that if she was up on her foot very long it swelled and became more painful. Dr. Graham wrote, "The patient is really not able to work because she just has too much swelling and pain in her leg when she tries to stand for long times." Dr. Graham asked her to follow up with her primary care provider regarding her tachycardia and to have a PET CT scan. (Tr. 634).

On April 13, 2010, Plaintiff saw Jane Moore for completion of disability paperwork and for a check of her blood pressure. (Tr. 661) Ms. Moore started Plaintiff on atenolol for palpitations/hypertension and noted that Plaintiff's DVT had been well-controlled with Coumadin therapy. (Tr. 662).

On April 14, 2010, Plaintiff saw Robert M. Pearson, DPM, a podiatrist, for pain in her calf and ankle. Dr. Pearson recommended ice, elevation, and compression and discussed surgery, physical therapy, and shoe gear. It was noted that walking was an aggravating factor and that Tylenol and Vicodin were relieving factors. (Tr. 620). Plaintiff followed up on April 22, 2009. (Tr. 618).

On April 21, 2010, Plaintiff saw Jane Moore, who assessed hypertension well controlled on atenolol; status post cervical cancer with a negative PET scan; Achilles tendonitis being treated by podiatry; and insomnia to be treated with Ambien. (Tr. 669).

On May 7, 2010, Plaintiff underwent a stress test due to chest pain. The results were negative for ischemia. (Tr. 626). On the same day, Plaintiff underwent a myoview study that revealed no evidence of myocardial ischemia, a normal systolic wall-thickening pattern, an ejection fraction calculated at 58%, and a normal right ventricular cavity size and normal right ventricular free wall function. (Tr. 624-25).

On May 26, 2010, Plaintiff saw Jane Moore, reporting that she had persistent pain from her DVT and that she was unable to work due to left lower extremity discomfort. She stated that he mood was fairly well controlled but that she had some difficulty with sleeping. (Tr. 654). Ms. Moore assessed status post cervical cancer; status post DVT with Coumadin therapy; postphlebotic syndrome; left Achilles tendonitis under the care of Podiatry; and palpitations which had improved. (Tr. 654-55). She recommended Celebrex,[8] trazodone for insomnia and possible anxiety, Ambien to be used only if needed, and staying off atenolol due to controlled heart rate and low blood pressure. (Tr. 655).

On July 1, 2010, Plaintiff saw Shannon Wright for evaluation of palpitations, which had recurred when she stopped atenolol. Plaintiff reported some anxiety and insomnia. (Tr. 650). The assessment was PAC – arrhythmia to be treated with atenolol; history of cervical cancer; anxiety to be treated with trazodone and possible SSRI therapy; and insomnia to be treated with Ambien. (Tr. 650-51).

---

[8] Celebrex is a brand name for celecoxib, which is used to relief pain, tenderness, swelling and stiffness caused by arthritis and other conditions. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html

On August 13, 2010, Plaintiff returned to Ms. Wright and reported that her palpitations had become rare and that trazodone and Ambien together helped her get adequate rest. She had no overt depression, and although she had anxiety, she did not want any other medications. She reported having difficulty standing or sitting for any long period of time due to leg pain. She also had bilateral hip pain and some low back pain. She previously took Vicodin intermittently, which she found helpful. Ms. Wright noted that an X-ray of Plaintiff's hips showed mild-to-moderate degenerative changes. (Tr. 689). The assessment was bilateral hip pain, history of lower left extremity DVT, history of cervical cancer, history of palpitation, and insomnia/anxiety. She was continued on hydrocodone (Vicodin) but advised to "really limit" it, Coumadin, trazodone, and Ambien; she refused a refill of Celebrex. Ms. Wright noted that she had filled out Plaintiff's disability paperwork and that "[Plaintiff] helped me in completing these answers. Many of them are subjective as not demonstrable in the office." (Tr. 690).

On September 29, 2010, Plaintiff saw Dr. Richard Dougherty to have a form filled out. The review of systems showed joint pain in both hips, as well as back pain. (Tr. 701). Examination showed a reduced range of motion in the hips and some edema in the left ankle. Dr. Dougherty prescribed Vicodin and Tylenol PM for hip pain, and support socks and Coumadin for her DVT. (Tr. 702).

On October 14, 2010, Plaintiff returned to Dr. Graham for follow-up. (Tr. 706). She reported continuing to have significant pain in her left calf; having significant pain and swelling when she stands or walks for more than 20 to 30 minutes; wearing an elastic stocking to minimize swelling; keeping her leg elevated as much as possible; and using Vicodin twice a week and Tylenol daily. (Tr. 706-07). The impression was DVT and chronic leg pain, and Dr. Graham recommended that her doctors consider stopping her Coumadin therapy. (Tr. 707).

## C. OPINION EVIDENCE

On April 13, 2010, Nurse Practitioner Jane Moore completed a Medical Source Statement – Physical ("MSSP") stating that Plaintiff could lift and/or carry 10 pounds frequently and 15 pounds occasionally; could stand and/or walk continuously for less than 15 minutes and for 1 hour in an 8-hour workday; could sit for 30 minutes continuously and for 2 hours in an 8-hour workday; could push and/or pull no more than 10 pounds; could occasionally climb; could never stoop, kneel, crouch, or crawl; must avoid any exposure to hazards or heights; suffered pain that required her to lie down or recline three times a day for an hour to 45 minutes; and had pain or used medication that caused a decrease in concentration, persistence, or pace such that she could not work quickly. (Tr. 613).

Ms. Moore also completed a Medical Source Statement – Mental indicating that Plaintiff was moderately limited in the ability to travel in unfamiliar places or use public transportation and was not significantly limited in any of the other listed areas of functioning. (Tr. 696-97).

On April 16, 2010, Dr. Graham completed an MSSP stating that Plaintiff could lift and/or carry less than five pounds occasionally or frequently; could stand and/or walk continuously for less than 15 minutes and for less than one hour in an eight-hour day; could sit continuously for less than 15 minutes; could sit for one hour in an eight-hour workday; had limited ability to push and/or pull; and could never climb, balance, stoop, kneel, crouch, crawl, reach, or handle; must avoid any exposure to extreme heat, extreme cold, weather, wetness/humidity, vibration, and heights; and suffers pain requiring her to lie down or recline every thirty minutes for one to two hours. (Tr. 615-16).

Dr. Graham also completed a Medical Source Statement – Mental indicating that Plaintiff was not significantly limited in any of the listed areas of functioning. (Tr. 693-94).

On August 13, 2010, Nurse Practitioner Shannon Wright completed an MSSP stating that Plaintiff could lift and/or carry 10 pounds frequently and occasionally; could stand and/or walk for 15 minutes continuously and for less than one hour throughout an eight-hour day; could sit for 30 minutes continuously and for less than one hour in an eight-hour day; had limited ability to push and/or pull; could never kneel, crouch, crawl; could occasionally climb and stoop; used a walker rarely; must avoid any exposure to extreme cold, heat, hazards, or heights; suffers pain requiring her to lie down or recline every hour for 15 to 30 minutes to alleviate symptoms; and uses intermittent narcotics for pain that cause a decrease in concentration, persistence, or pace. (Tr. 686). It appears that the form was also signed by Dr. Daugherty. (Tr. 684-86).

### D. VOCATIONAL EVIDENCE

Vocational Expert Karen Nielson, Ph.D. testified at the hearing before the ALJ. (Tr. 35-39). She testified that Plaintiff's past work was as a production worker, medium, unskilled, SVP 2, DOT # 52965870. (Tr. 36). The ALJ described the following hypothetical individual to the VE:

> Let's consider an individual who is the same age, education, and work experience as the claimant. Said individual would be relegated to light work. Further limited to simple routine repetitive tasks. Not performed in any fast paced production environment. Involving only simple work-related decisions and relatively few workplace changes. In addition to that, limited to only occasional interactions with supervisors, coworkers, and the general public.

(Tr. 36-37). The VE testified that such an individual could not do Plaintiff's past work. However, she testified that such an individual could do light, unskilled work as a mail clerk; a copy machine operator (#207689014); an office helper (#239567010), and an office cleaner (#323678014). (Tr. 37). The ALJ asked whether there would be any sedentary jobs for the same individual, and the VE responded that there would be jobs such as final assembler (#713687018, 4,000 jobs in the state and 185,000 jobs nationwide); sorter (#521687086, 4,000 jobs in the state

and 135,000 nationwide), and charge account clerk (#205367014, 3,500 to 190,000 jobs nationwide). (Tr. 37-38).

The VE also testified that if a person were required to take 30-minute breaks approximately every hour to recline, that would eliminate competitive employment. (Tr. 38-39).

## II.     PROCEDURAL HISTORY

On November 20, 2009, Plaintiff applied for DIB; that application was initially denied. (Tr. 41-42, 45-49). On March 18, 2010, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 52-53). After a hearing before the ALJ on November 10, 2010, the ALJ issued an unfavorable decision. (Tr. 14-23). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council, but the Council declined to review the case on March 8, 2012. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## III.     STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an

adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.   DECISION OF THE ALJ

Applying the foregoing five step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since December 18, 2008, her alleged onset date; had severe impairments of deep vein thrombosis and depression; and was in status post cervical cancer, now in complete clinical remission. (Tr. 16). He found that she did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ found that Plaintiff had the RFC to perform the exertional demands of sedentary work, could stand and walk for two hours and sit for six hours in a work day; was limited to simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple, work-related decisions, relatively few workplace changes, and only occasional interaction with her supervisors, co-workers, or the general public. (Tr. 18). He found that Plaintiff was unable to perform any of her past relevant work; however, relying on the testimony of a vocational expert, he found that she could perform jobs that exist in significant numbers in the national economy, such as photocopy machine operator, office helper, and office cleaner. (Tr. 22). Thus, the ALJ concluded that Plaintiff had not been under a disability from December 18, 2008, through the date of his decision. (Tr. 23).

In appealing the ALJ's decision, Plaintiff contends the ALJ's decision should be reversed because (1) the jobs identified by the ALJ require light work, whereas the ALJ limited Plaintiff to sedentary work only; (2) the ALJ erred by failing to give controlling weight to the Medical Source Statements – Physical of Plaintiff's treating physician; (3) The ALJ erred by failing to account for all of Plaintiff's impairments in his RFC; and (4) the ALJ failed to conduct a proper credibility analysis.

## V.    DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)). "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court

must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. THE ALJ'S FINDING AT STEP FIVE THAT PLAINTIFF COULD PERFORM WORK AS A PHOTO-COPY MACHINE OPERATOR AND OFFICE HELPER

Plaintiff first argues that the ALJ erred by finding, at Step Five, that Plaintiff could perform work as a photo-copy machine operator and office helper—positions requiring the ability to perform light work—when the ALJ had limited Plaintiff to sedentary work only. At Step Five, the Commissioner bears the burden of proving that, given the claimant's RFC, age, education, and work experience, there are a significant number of jobs in the national economy that the claimant can perform. *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c).

Plaintiff is correct that the specific jobs ALJ identified in his decision are inconsistent with the ALJ's assessment of Plaintiff's RFC. However, after review of the ALJ's decision, in conjunction with the testimony of the vocational expert, it appears that this was merely a harmless error in opinion drafting.

At the administrative hearing, the ALJ posed a hypothetical question to the VE describing a person whose RFC matched Plaintiff's RFC, except that the person could perform light work. (Tr. 36-37). The VE testified that such a person could do jobs such as copy machine operator, office cleaner, and office helper. (Tr. 37). The ALJ then asked, "Would there be any sedentary jobs for the same individual?" The VE responded:

> Yes. According to that hypothesis, if sedentary, unskilled, there would be jobs such as final assembler, 713687018. There are 4,000 in the State and 185,000 nationwide. A sorter, 521687086. There are 4,000 in the State and 135,000 nationwide and then we will take a charge account clerk, 205367014. It looks like 3,500 to 190,000 nationwide.

(Tr. 37-38).

As Defendant argues, it appears that when the ALJ drafted his decision, he mistakenly cited the light exertional level jobs identified by the VE instead of the sedentary jobs identified by the VE. Nevertheless, there was clear vocational expert testimony in the record identifying jobs that a person with Plaintiff's sedentary RFC could perform—final assembler, sorter, and charge account clerk. Thus, the ALJ's finding that there were jobs existing in significant numbers in the national economy that Plaintiff could perform was supported by substantial evidence. The ALJ's drafting error with respect to Step Five does not require reversal. *See Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case.").

### C. THE ALJ'S FAILURE TO GIVE CONTROLLING WEIGHT TO THE MEDICAL SOURCE STATEMENT – PHYSICAL OF PLAINTIFF'S TREATING PHYSICIAN

Plaintiff next argues that the ALJ erred by not giving controlling weight to the MSSP completed by Plaintiff's treating physician, Dr. Graham, that Plaintiff can lift or carry less than five pounds, can stand or walk for fewer than 15 minutes a time and for less than one hour in an eight-hour workday, can sit for only 15 minutes at a time and for one hour in an eight-hour workday, is limited in her ability to perform postural maneuvers, is limited in her ability to push and pull due to poor energy, and must avoid exposure to dust and hazards and be permitted to lie down for one to two hours every thirty minutes due to pain.

Although a treating physician's opinion is generally given controlling weight, it is not inherently entitled to it. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic

techniques and it must not be "inconsistent with the other substantial evidence in [the] case record." *Hacker*, 459 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). *See also Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007). It is the ALJ's duty to resolve conflicts in the evidence, and the ALJ's finding in that regard should not be disturbed so long as it falls within the "available zone of choice." *See Hacker*, 459 F.3d at 937-938. "'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" *Martise v. Astru*e, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)).

Here, the ALJ found Dr. Graham's statement unreliable except to the extent that it would limit Plaintiff to sedentary work, and he offered several good reasons for his assessment. (Tr. 19). First, the ALJ pointed out that Dr. Graham's opinion was inconsistent with her notes from six months earlier indicating that Plaintiff was "doing well" and could return to full-time work at her job—a job that involved heavy lifting, walking, and standing all day. (Tr. 19, 34, 392-93). Dr. Graham's treatment notes in the interim do not suggest a worsening of Plaintiff's DVT or any other conditions that would explain such a dramatic change in opinion. ""[A]n ALJ may discount or even disregard the opinion of a treating physician . . . where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Second, as the ALJ noted, many of Dr. Graham's opinions had no support in the medical record, including her own treatment notes. The ALJ properly pointed out that there is no support in Plaintiff's treatment records for the limitations Dr. Graham assessed on Plaintiff's ability to reach, handle, or be exposed to environmental factors. (Tr. 19). In addition, Dr. Graham's opinion that Plaintiff could lift and carry less than five pounds is not supported by her notes and

is inconsistent with physical therapy notes stating that Plaintiff was able to lift 25 pounds to various levels without pain or discomfort. (Tr. 400). Moreover, the extreme limitations on walking, standing, and sitting in Dr. Graham's opinion are not supported by the medical evidence. Although Plaintiff reported to Dr. Graham that she had pain in her hip and leg when she stood for long periods of time and significant swelling when she stood or walked for more than 20 or 30 minutes, she did not report that she could not sit or walk for even 15 minutes, nor did Dr. Graham note any objective findings that would suggest that Plaintiff had such debilitating limitations. To the contrary, Plaintiff reported in late 2009 and 2010 that her cancer rehab and strengthening had helped her significantly, that she was "doing well," that her only pain was some hip and thigh achiness for which she took Extra Strength Tylenol, and that her hip pain was diminishing. (Tr. 254-55, 637). In addition, in a January 2010 examination, Dr. Graham observed only "minimal edema" and found that Plaintiff had "good ambulation." (Tr. 638). The lack of support for Dr. Graham's opinions in her own treatment notes was a proper consideration for the ALJ in determining what weight to give those opinions. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (holding the ALJ did not err in giving minimal weight to the report of a treating physician where the opinion was conclusory and contained significant limitations not reflected in his treatment notes); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (affirming the ALJ's decision to discount the opinion of a treating physician where it contained limitations that "stand alone" and "were never mentioned in [the physician's] numerous records of treatment . . . nor were they supported by any objective testing or reasoning which would indicate why the claimant's functioning need be so restricted").

Third, the ALJ properly considered the conservative course of treatment Plaintiff's physicians had prescribed. (Tr. 20). Plaintiff was prescribed various medications, as well as physical therapy, for her DVT and hip pain; however, it does not appear that her physicians have recommended injections, surgery, or other more aggressive treatment. (Tr. 21). *See Perkins v. Astrue*, 648 F.3d 892, 898-99 (8th Cir. 2011) (finding the ALJ properly discounted a Medical Source Statement in part because the claimant had received only conservative treatments).

The undersigned further notes that Dr. Graham's opinions are inconsistent with the statement of Dr. Kurt Nichols, M.D., a surgeon who saw Plaintiff in December 2009 and found "no evidence of leg pain" or of venous stasis or any other pathology. (Tr. 591). Furthermore, Dr. Graham's opinion was inconsistent with the opinion of Plaintiff's nurse practitioner Jane Moore, who opined that Plaintiff could sit for 30 minutes continuously and for two hours total in an eight-hour workday and could lift and/or carry ten pounds frequently. (Tr. 612).[9]

As Plaintiff points out, some of the restrictions in Ms. Wright and Dr. Daugherty's MSSP were consistent with Dr. Graham's opinions regarding some of Plaintiff's abilities, including the total amount of sitting Plaintiff could do in a day and the amount of standing and/or walking she could do.[10] (Tr. 685-86). However, the ALJ discounted that MSSP for many of the same

---

[9] The undersigned recognizes that, as a nurse practitioner, Ms. Moore is not an "acceptable medical source" under the regulations, but is rather an "other" medical source, and that therefore her opinion is not entitled to the same weight normally given to a treating physician. *See* 20 C.F.R. §§ 404.1513(a) & (d)(1); Social Security Ruling 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (noting that "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). Nevertheless, she is an appropriate source of evidence regarding the severity of Plaintiff's impairment and the effect of that impairment on Plaintiff's ability to work. *See Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003).

[10] With respect to many of Plaintiff's abilities, however, Ms. Wright's and Dr. Daugherty's opinions are significantly less restrictive than those of Dr. Graham. For example, whereas Dr. Graham found that Plaintiff could "never" reach, handle, or climb, Ms. Wright and Dr.

reasons he used to discount Dr. Graham's MSSP. (Tr. 20). Moreover, the value of that MSSP is seriously undermined by Ms. Wright's statement that, with regard to the MSSP, "[Plaintiff] helped me in completing these answers. Many of them are subjective as not demonstrable in the office." (Tr. 690). The fact that a physician's opinion is based largely on a claimant's subjective complaints is a proper reason to give the opinion less weight. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (affirming where the discounted the opinions of a physician in part because he "cited only limitations based on [the claimant's] subjective complaints, not his own objective findings").

In sum, in light of the above inconsistencies in Dr. Graham's opinions and the inconsistencies between Dr. Graham's opinions and other medical evidence in the record, the ALJ's decision to give less than controlling weight to Dr. Graham's opinion was supported by substantial evidence and fell within the "available zone of choice." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) ("As there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice.").

### D. THE ALJ'S DETERMINATION OF PLAINTIFF'S RFC

Plaintiff next argues that the ALJ failed to account for all of her impairments in determining her RFC, and that the RFC was not based on any of the medical evidence in the record.

A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record,

---

Daugherty found that Plaintiff could frequently reach and handle and could occasionally climb. (Tr. 616, 686).

'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). "[B]ecause RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.*

Plaintiff's first point is that the ALJ erred by failing to include limitations related to her DVT and bilateral hip pain, such as limitations on the amount of time she could spend sitting, standing, or walking. However, this argument fails to recognize that the ALJ's restriction of Plaintiff to sedentary work demonstrates that he did find significant limitations in her ability to stand and walk. Sedentary work is defined in the regulations as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Consistent with the definition of sedentary work, the ALJ further explained that Plaintiff could "lift and carry 10 lbs occasionally and less than that weight frequently, with pushing and pulling the same, and can stand and walk for 2 hours and sit for 6 hours in the usual work day." (Tr. 18). *See also* Social Security Ruling 83-10, 1983 WL 31251, at *5 (1983) (stating that sedentary work generally involves standing or walking no more than about 2 hours of an 8-hour day). The ALJ's determination that Plaintiff could perform only sedentary work, with its limitations on standing, walking, and lifting, demonstrates that the ALJ did impose significant limitations related to Plaintiff's DVT and hip pain. *See Ellis v. Barnhart*,

392 F.3d 988, 994 (8th Cir. 2005) (noting that a limitation to sedentary work "in itself is a significant limitation").

With respect to Plaintiff's allegations regarding her inability to sit and her need to lie down for 30 minutes every one to two hours due to pain and fatigue, the ALJ properly found those allegations not credible (as discussed below) in light of the lack of objective medical evidence supporting such extreme limitations, Plaintiff's history of conservative treatment, and Plaintiff's intermittent use of strong pain medication. (Tr. 18-21).

Plaintiff further argues that the ALJ erred by rejecting all of the numerous opinions on record in this case and assessing Plaintiff's RFC only based on his subjective impressions. The undersigned finds no error. Contrary to Plaintiff's contention, the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians" in determining a claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quotation marks omitted); *Martinez v. Colvin*, No. 12-3042-CV-S-ODS-SSA, 2013 WL 1945703, at *5 (W.D. Mo. May 10, 2013 (rejecting the plaintiff's argument that because the ALJ gave little weight to the opinions of Plaintiff's physicians, the RFC assessment was necessarily the product of unsupported speculation). Instead, "[i]t is the ALJ's responsibility to determine [claimant's] RFC based on all the relevant evidence." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted). Here, although the ALJ's RFC did not mirror any of the particular opinions in the record, the ALJ determined Plaintiff's RFC based on all of the evidence in the record, including opinion evidence. (Tr. 16-22).

Moreover, here, the ALJ did not completely disregard the Medical Source Statement of Plaintiff's treating physician, Dr. Graham, but rather gave weight to it only to the extent that it

would limit Plaintiff to sedentary work; thus, Dr. Graham's report provides some medical evidence in support of Plaintiff's RFC. (Tr. 19). The ALJ further supported his RFC by conducting an extensive review of Plaintiff's medical records, including the objective medical evidence in support of Plaintiff's complaints, and he noted the lack of objective evidence to support her complaints and Plaintiff's history of conservative treatment for her conditions. (Tr. 16-18, 19-21). The ALJ's RFC is further supported by Plaintiff's physical therapy records, which indicate that Plaintiff could lift 25 pounds without pain or discomfort and had met all of her physical therapy goals, including decreasing her pain with daily activities to 3/10 and improving her endurance to return to work. (Tr. 400, 403).

In sum, the ALJ's assessment of Plaintiff's RFC was supported by substantial evidence, including medical evidence, and thus the undersigned finds no error.

## E. THE ALJ'S EVALUATION OF THE CREDIBILITY OF PLAINTIFF'S SUBJECTIVE COMPLAINTS

Finally, Plaintiff argues that the ALJ's analysis of the credibility of Plaintiff's complaints was inadequate and did not properly take into account the credibility factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

In determining a Plaintiff's RFC, "'the ALJ first must evaluate the claimant's credibility.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002)). When evaluating the credibility of a plaintiff's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v.*

*Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). It is sufficient if the ALJ "'acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* The ALJ may not discount allegations of disabling pain solely because they are not fully supported by the medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole. *Goff*, 421 F.3d at 792.

Here, the ALJ listed the relevant credibility factors and specifically discussed several of them, including the duration and intensity of Plaintiff's pain; the factors that precipitate, aggravate, and relieve her pain; the types and dosages of medications she has taken; the functional restrictions placed upon Plaintiff by her doctors at various points; and the absence of objective medical evidence supporting Plaintiff's complaints. (Tr. 19-21).

The ALJ properly noted that the objective medical evidence did not fully support Plaintiff's allegations of disabling symptoms. (Tr. 20-21). Although Plaintiff had DVT and complained of swelling and leg pain, Plaintiff's doctors generally observed either no edema or minimal edema in her leg. (Tr. 218, 257, 288, 427, 638, 650, 654, 661, 678, 707). Moreover, Dr. Nichols found "no evidence of leg pain" or of venous stasis or other pathology. (Tr. 591). In addition, although Plaintiff complained of bilateral hip pain, an X-ray of Plaintiff's hips showed only mild-to-moderate degenerative changes. (Tr. 689). *See Goff*, 421 F.3d at 792 (holding that it was proper for the ALJ to consider unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints); *Forte v. Barnhart*, 377 F.3d 892, 896

(8th Cir. 2004) (stating that "lack of objective medical evidence is a factor an ALJ may consider" in discounting allegations of disabling pain).

The ALJ also properly considered that Plaintiff's history of conservative treatment was consistent with mild to moderate pain but not with disabling limitations. (Tr. 21). Plaintiff's doctors recommended compression stockings, various medications, and a short course of physical therapy to treat Plaintiff's DVT, pain, and weakness; however, they did not recommend more aggressive treatment, such as surgery or injections. A pattern of conservative medical treatment is a proper factor for the ALJ to consider in evaluating a claimant's credibility. S*ee Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).

In addition, the ALJ properly considered evidence that Plaintiff used strong pain medication only intermittently. (Tr. 21). Plaintiff testified that she used Vicodin every day. (Tr. 31). However, the record as a whole shows that she has not done so regularly: she told Dr. Graham on January 7, 2010 that she took Vicodin "not very often"; she reported on January 15, 2010, that she was only taking Tylenol; she told Ms. Moore in April 2010 that she was not taking Vicodin or any pain medication; she told Ms. Wright in August 2010 that she used Vicodin only intermittently; and she told Dr. Graham in October 2010 that she used Vicodin only twice a week and took Tylenol, arthritis daily. (Tr. 637, 665, 679, 689, 706). She also told health care providers in July and October 2009 that she was only taking Extra Strength Tylenol. (Tr. 254, 256). The fact that Plaintiff was not regularly taking strong pain medication was a proper factor for the ALJ to consider in evaluating the credibility of her subjective complaints of disabling pain. *See Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999) ("While [the plaintiff] had prescriptions for several stronger medications, he primarily used only over-the-counter pain-

relief remedies . . . This is yet more evidence to support the ALJ's credibility determination.") ; *Wagner v. Astrue*, 499 F.3d 842, 851 ("'A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications.'") (quoting *Singh*, 222 F.3d at 453).

The undersigned further notes that, contrary to Plaintiff's argument that "Crider's treatment history from her physical therapy sessions show that she did not improve," Plaintiff's final physical therapy notes state, "Pt. reports soreness to legs after therapy but is overall improving well and has made great progress since starting rehab with strength, endurance to activities" and indicate that the goal of decreasing pain to 3/10 with daily activities had been met. (Tr. 403). These notes support, rather than undermine, the ALJ's assessment of the credibility of Plaintiff's complaints of pain and weakness.

The undersigned acknowledges that there is some medical and other evidence in the record that provides some support for Plaintiff's allegations regarding her disabling pain and fatigue. However, the undersigned "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)). The ALJ did so in this case.

## VI.    CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying benefits be **AFFIRMED**.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of June, 2013.